## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

WADE MARTIN ROME                                              Case No. 6:15-bk-02498-KSJ
KATHLEEN MALONEY ROME,                                        Chapter 7
Debtors.

———————————————————————————/

JOHN BELTRAMO, AS TRUSTEE OF THE JOHN W.
BELTRAMO REVOCABLE TRUST DATED FEBRUARY
27, 1992, (hereinafter "BELTRAMO"),

                                                             Adv. Proc. No.

v.

WADE MARTIN ROME and
KATHLEEN MALONEY ROME

———————————————————————————/

## ADVERSARY COMPLAINT

Unsecured Creditor, John Beltramo, as Trustee of the John W. Beltramo Revocable Trust dated February 27, 1992, (hereinafter "Beltramo"), by and through his undersigned attorney, hereby sues Wade Martin Rome (the "Debtor Husband") and Kathleen Maloney Rome (the "Debtor Wife"), (together referred to as the "Debtors,"),  and alleges:

### PARTIES, JURISDICTION, AND VENUE

1.      The Debtors filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code on March 23, 2015 (the "Petition Date"), in the Bankruptcy Court of the Middle District of Florida, Tampa Division (the "Bankruptcy Case").

2.      Carla Musselman is the acting Chapter 7 Trustee (the "Trustee").

3.      The Debtors are individuals, have been husband and wife at all times relevant

hereto, and are residents of the State of Florida.

4.     This Court possesses "core" jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(I)(J) and 28 U.S.C. § 1334, and related law.

5.     Venue properly lies before this Court pursuant to 28 U.S.C. § 1409 and other applicable law.

## CASE BACKGROUND , GENERAL ALLEGATIONS AND DEFINITIONS

6.     On April 6, 2015, the Debtors filed their Schedules ("Schedules") [Docket # 8, pages 1 – 48].

7.     Both Debtors listed personal property on Schedule D of the Schedules in the aggregate amount of $25,767.25, comprised of household goods and furnishings, two large tapestries, machinery and equipment, two Wave Runners and trailers, a 1998 vehicle, causes of action, and a pre-paid college plan.

8.     The Debtor Husband listed clothing, jewelry, a weapon, an E*TRADE account, his interest in Apex Radiology, Inc., and a cause of action against Radiosphere, all having an aggregate value of $977.00.

9.     The Debtor Wife listed clothing, jewelry, fur coats, and a camera as her personal property, having an aggregate value of $2,115.00.

10.     As of the Petition Date, the Debtors claimed that they had no cash in their custody or control and only $148.00 in their joint bank account at Florida Commerce Bank (the "FCB Account").

11.     The Debtors listed a 1998 Dodge Ram truck as the only vehicle owned by them with a value at or below the statutory exemption allowed for automobiles pursuant to Florida Statutes (the "Debtor Truck").

12.     The Debtors seek to discharge a total of $4,798,163.53 of unsecured debt by the filing of the Bankruptcy Case.

13.     The Schedules do not list any secured debt, and only $1,609.95 in priority debt of the Debtor Husband, dating from a 2007 Missouri Department of Revenue claim.

14.     Schedule I states that both Debtors are unemployed and generate no income. In response to Question No. 13 of Schedule I, the Debtors indicated that there is not likely to be an increase or decrease in their income in the year following the Petition Date. However, the Debtor Husband has testified at the Meeting of Creditors and September 3 and 15, 2015. 2004 Examinations that he now has income from providing private training sessions at $85.00 per hour and from conducting other business ventures.

15.     Schedule J shows monthly expenses in the aggregate amount of $12,313.10, including premiums for life insurance of $1,512.78 and alimony, maintenance, and support in the amount of $503.25.

16.     In response to Question No. 24 of Schedule J, the Debtors indicated that they do not expect an increase or decrease in their expenses within the year following the Petition Date. However, the Debtor Husband testified at the 341 Meeting that the child support payments for his natural son would terminate on or about June 2015, clearly within the year following the Petition Date.

17.     The Debtors listed in the Schedules claims against Tulving Company and F&S, both defined below.

18.     On April 6, 2015, the Debtors filed their Statement Of Financial Affairs ("SOFA") [Docket #8, Pages 50 – 59].

19.     The SOFA shows no income for the Debtors in the years 2013, 2014 and 2015 pre-petition, other than consulting income in the amount of $10,800 earned by the Debtor Husband in 2014.

20.     On the eve of filing the Bankruptcy Case with $12,000 in alleged monthly expenses to be paid, assets that are disproportionate to the debt sought to be discharged and leaving less than $150.00 in the Debtors' joint bank account, the Debtors made a loan repayment of $5,000.00 to Vernon Rome, the Debtor Husband's father.

21.     The Debtors failed to disclose the insurance loss from the Debtors' Missouri property in SOFA Paragraph 8 or the losses attributed to the Lead Shot and the failure to return the Debtors' coins described below with respect to Tulving.

22.     On April 22, 2015, the first session of the Debtors' Meeting of Creditors occurred ("April MOC").

23.     On June 12, 2015, the second session of the Debtors' Meeting of Creditors occurred ("June MOC").

24.     On July 24, 2015, the third session of the Debtors' Meeting of Creditors occurred ("July MOC").

25.     On August 12, 2015, the fourth and final session of the Debtors' Meeting of Creditors occurred ("August MOC").

26.     On September 2, 2015, the 2004 Examination of Debtor Wife was taken ("Debtor Wife's 2004 Exam").

27.     On September 3, 2015, the 2004 Examination of Debtor Husband was taken ("Debtor Husband's September 3rd 2004 Exam").

28.     On September 15, 2015, the 2004 Examination of Debtor Husband was taken and concluded ("Debtor Husband's September 15th 2004 Exam").

29.     On April 28, 2015, the Trustee transmitted correspondence to the Debtors requesting documents pertaining to the contingent assets the Debtors identified as being available for liquidation by the Trustee and itemizing twenty eight (28) categories of documents she wanted the Debtors to produce ("Trustee's Document Request").

30.     The Debtors have repeatedly testified at the Meetings of Creditors and 2004 Examinations that they have provided all documents available to the Trustee.

31.     The Debtors have repeatedly testified at the Meetings of Creditors and 2004 Examinations that they have fully disclosed all assets and liabilities on their Schedules and that same are true and accurate.

## BUSINESS ENTERPRISES

32.     In or about 1997, the Debtor Husband became active in the radiology business and other various business ventures.

33.     The Debtor Husband formed various corporate entities in Florida and Missouri, including but not limited to:

    A.  Rome Enterprises Group, Incorporated, an Illinois Corporation, formed on July 30, 1996;

    B.  Sound Proof, Inc., a Florida Corporation, formed on November 14, 1994;

    C.  Apex Radiology, Inc., a Florida Corporation, formed on June 13, 1997;

    D.  Vector Management Services, Inc., a Florida Corporation, formed on January 2, 1998;

    E.  Rival Industries, Inc., a Florida Corporation, f/k/a Rival Sports, Inc., formed on August 4, 1999;

    F.  Addison River Enterprises, Inc., a Florida Corporation, f/k/a Bandwidth, Inc.,

formed on October 1, 1999;

G. NHB Sports, Inc., a Florida Corporation, formed on January 21, 2000;

H. Landtech Funding Corporation, a Florida Corporation, formed on October 21, 2002;

I. Apex Radiology Investments, LLC, a Florida LLC, converted from Apex Radiology Investments, LLC, a Georgia LLC, on January 13, 2004;

J. Radvanced, LLC, a Florida LLC, converted from Radvanced, LLC, a Georgia LLC, on April 30, 2004;

K. Beeline Realty, Inc., a Florida Corporation, f/k/a Antiquities International Incorporated, formed on September 16, 2005;

L. DelMart Development, LLC, a Missouri LLC, formed on March 7, 2006;

M. Macon Payday Loans, Inc., a Missouri Corporation, d/b/a Macon Finance Co., formed on May 30, 2006;

N. American Top Team of Missouri, Inc., a Missouri Corporation, formed on September 23, 2005, and named changed to Rome Enterprises, LLC on 10/29/2008;

O. Macon Payday Loans, Inc., registered to do business in Florida on June16, 2014;

P. Rome Enterprises, LLC, d/b/a Oak Hill Estate;

Q. Rome Enterprises, LLC, d/b/a Copykat Bags;

R. Rome Enterprises, LLC, d/b/a American Top Team of Missouri, LLC; and

S. Go Limo, LLC.

34. Some of the Debtor Husband's other business ventures included but are not limited to:

A. A limousine service;

B. Restaurants;

C. Management of UFC fighters;

D.  An American Top Team gym and other activities associated with American Top Team;

E.  Speculation in real estate; and

F.   Operation of a payday loan company, Macon Payday Loan, Inc. ("MFC").

35.    In addition to the formal business ventures, the Debtor Husband has testified that he regularly engages in informal transactions whereby he buys and sells different products, including but not limited to, architectural salvage, gold and silver coins and bullion, vehicles, and other items of personal property.

36.    From 1997 through 2007, the Debtor Husband was primarily involved with Apex Radiology, Inc.

37.    Apex provided national teleradiology services that enabled the prompt delivery of radiology services from remote locations. Radiologists reviewed actual tests via remote imaging and provided interpretative reports with regard thereto on an immediate and timely basis.

38.    The Debtor Husband provided management and leadership services to Apex over a period of years, including but not limited to overseeing the complex computer systems needed to provide Apex's services and the transition of those computer systems from Florida to Missouri.

39.    The Debtor Husband owned 51% of the stock of Apex, with the remaining shares held by Robert Thomas, individually, Frederick Laufer, individually, Brian Kaufman, individually, Robert Thomas III, Trustee of the Robert Thomas Revocable Trust dated April 6, 1989, Frederick Laufer, M.D. and Laura Walsh as tenants by the entireties, and Richard F. Kaufman and Norma V. Kaufman, trustees of Kaufman Revocable Living Trust dated January 30, 1996 (collectively, the "Apex Creditors").

40. The Debtor Husband was and is sophisticated in the use of the computer systems used by Apex in the course of its business and computer systems in general.

41. Debtor Wife's post-secondary education was in the medical field.

42. However, the Debtor Wife ceased working in the medical field prior to 2007 and has been a housewife not employed outside the home, and worked in tandem with the Debtor Husband in support of his companies and business enterprises as needed.

43. Upon information and belief, the Debtor Wife never took an official role in the companies and many business enterprises of the Debtor Husband.

44. Debtor Wife has testified that she held no ownership interest in, and was not an officer, director, manager, or formal employee of any business owned in whole or part by the Debtor Husband.

45. Nevertheless, it is apparent from the evidence reviewed that the Debtor Wife regularly acted as the Debtor Husband's agent in financial transactions related to the entities.

46. The Debtor Wife had signatory authority on bank accounts of many of the Debtor Husband's business enterprises and consistently and in the ordinary course of business would make deposits and withdrawals, many of them in cash, from the various business bank accounts.

47. The Debtor Wife also authorized transfers to or from the business accounts and the Debtors' personal accounts, from 2008 through the Petition Date.

48. Further, the Debtor Wife testified that she sometimes retained large amounts of cash as she became increasingly worried about their financial status.

49. In 2007, Apex sold substantially all of its assets (the "Asset Sale") to Franklin & Sidelman, LLC, n/k/a Radisphere National Radiology ("F&S"). The terms of the Asset Sale required an initial cash payment of $4,100,000.00 (the "Initial Payment") and execution of a

promissory note in the amount of $3,500,000.00 to be paid by periodic payments over a period of three years, with credits for events that were negotiated in the sales agreement between Apex and F&S (the "F&S Note").

50.     The Debtor Husband, as a result of his ownership of Apex stock received approximately $1,500,000 of the Initial Payment.

51.     As part of the Asset Sale, the Debtor Husband was given an employment and consulting contract with F&S.

52.     Following the Asset Sale, the Debtor Husband became an F&S employee pursuant to that contract.

53.     At some point subsequent to the Asset Sale F&S breached the F&S Note and approximately one year after the Asset Sale F&S terminated the Debtor Husband's employment with F&S.

54.     Following his termination by F&S, the Debtor Husband became, as he defined it, a "professional litigator".

55.     The Debtor Husband was authorized by the other shareholders of Apex to institute and oversee litigation to collect upon the F&S Note (F&S Note Litigation") which was initiated in federal court in Ohio, although subsequently transferred to arbitration, and to represent Apex and the other shareholders' interests as well as his own in the F&S Note Litigation.

56.     Debtor Husband also initiated litigation against F&S for breach of his employment and consulting contract ("Employment Litigation").

57.     In addition, the Debtor Husband managed and oversaw the many claims that began to be made against him and his companies, or against him and the Debtor Wife.

58.    The Debtors' financial records reflect that from 2009 the Debtors treated many of the Debtor Husband's business enterprises as alter egos of the Debtors or Debtor Husband by paying personal bills or making personal purchases from various business bank accounts, transferring sums to and from the businesses and to and from the businesses and Debtors' personal accounts without any business basis, following the legal or corporate formalities, or maintaining sufficient books and records to memorialize and document such transfers and transactions.

59.    The Debtors' further comingled the income and assets derived from one or more of Debtor Husband's business enterprises.

60.    On Schedule I, the Debtors indicated that neither of them were employed on the Petition Date and their income on the Petition Date was zero [Docket #8, page 45].

61.    On their SOFA, the Debtors indicated their income in 2013 and 2014 was zero [Docket #8, page 50].

62.    The only pre-petition income stated in the SOFA was $14,000 earned by the Debtor Husband in 2014 for consulting [Docket #8, page 50]. However, Debtor Husband subsequently testified that he was offering private training sessions at $85 per session and had conducted 18 to 25 sessions in 2015.

63.    Upon information and belief, prior to the Petition Date the Debtor Husband provided services as a head coach at ATT Rockledge, located in Rockledge, Florida and also provided services at ATT Space Coast located in Cocoa Beach, Florida.

64.    In his September 3rd 2004 Examination the Debtor Husband testified that he earned no income from his pre-Petition services but had started to earn money for his services paid post-Petition.

65.     In addition, upon information and belief, the Debtor Husband is affiliated with ATT AMPD, a gym located in Macon Missouri in which Hannah and Brandon Zeciri appear to have an ownership interest.  Advertisements for the gym (revised shortly after the September 3rd Examination) suggested that the Debtor Husband travels to the gym several times a year for the purpose of assisting Brandon Zeciri with classes and training.

## B&H AUTO AND DEBTORS' AUTOMOBILES

66.     The Debtor Husband, together with Brandon Zeciri, incorporated B&H in Missouri on or about August 8, 2011.

67.     Upon information and belief, the Debtor Husband, Brandon Zeciri, and Hannah Zeciri executed and filed with the Missouri Department of Revenue an application for an automobile dealer license on behalf of B&H (the "B&H Application").  The B&H Application represented that the Debtor Husband, Brandon Zeciri, and Hannah Zeciri each held an ownership interest in B&H.

68.     Upon information and belief, the Missouri Department of Revenue approved the B&H Application and issued a dealer license to B&H (the "B&H License") that was effective through the remainder of 2011.

69.     In connection with the B&H License, the Missouri Department of Revenue assigned D9213 as B&H's dealer number and issued master dealer plates with that number (the "Master Plate").  The Master Plate comprised a front and back plate to be used on one vehicle, as required by Missouri law.

70.     Upon information and belief, the Missouri Department of Revenue issued additional dealer plates at some point in time, each of which had a unique letter identifier in addition to the dealer number and each of which included a front and back plate.

71.     Upon information and belief, in the fall of 2011 and 2012, Brandon Zeciri made application on behalf of the owners of B&H to the Missouri Department of Revenue to renew the B&H License for the years of 2012 and 2013, and both renewal applications were approved.

72.     In each of the renewal applications the Debtor Husband continued to be listed as an owner of B&H.

73.     Debtor Husband testified that when he relocated from Missouri to Florida, he had an arrangement with B&H whereby he would acquire vehicles in Florida on behalf of B&H and arrange their shipping to Missouri for B&H to then offer the vehicles for sale. In addition, B&H Auto would purchase vehicles in Missouri and ship them to Debtor Husband in Florida for sale by Debtor Husband.

74.     In fact, Debtor Husband testified this arrangement with B&H Auto was one of the reasons he rented the warehouse space from Noro, Inc., identified on Schedule G.

75.     There was no written agreement or contract with regard to this arrangement.

76.     Debtor Husband testified he did not hold a Florida dealer license for this arrangement as he could effectuate a certain number of transactions without one, although he didn't know the limit on the number of transactions permitted.

77.     On or about August 26, 2010, the Debtor Husband purchased a 2001 Honda Odyssey ("Odyssey").  The title for the Odyssey shows the purchaser as Wade Rome, B&H Auto.

78.     The Odyssey is the primary vehicle utilized by the Debtor Wife for transportation.

79.     The title appears to have been altered after the fact both because B&H was not in existence at the time of the sale and because the address provided for B&H in the title was not the address from which it operated at the time of the purchase.

80.     Because the purchase of the Odyssey precedes the incorporation of B&H, as a matter of law and fact B&H could not hold any legal interest in the Odyssey.

81.     The Debtor Husband holds a legal and equitable interest in the Odyssey by virtue of its acquisition prior to the incorporation of B&H.

82.     The Debtor Wife holds an equitable interest in the Odyssey by virtue of her primary use of the vehicle and payment for substantial repairs to the vehicle in June 2013.

83.     On or about March 23, 2012, the Debtor Husband and/or the Debtors acquired a 2005 Nissan Titan ("Titan") from Boomer Trucks, in Longwood, Florida.

84.     The Debtor Husband caused the payment to be made for the Titan from a bank account of MFC in the amount of $9,300.00.  There is no notation in the memo line of the check to Boomer Trucks signed by the Debtor Husband that indicates the payment was being made for the benefit of B&H.

85.     There is no indication clearly ascertainable from the records produced by the Debtors that suggests that B&H reimbursed or repaid MFC or the Debtors for the purchase of the Titan.

86.     Pursuant to the statutes and rules governing dealers in Missouri, B&H was required to notify the Missouri Department of Revenue of its "storage" of any vehicles that it held for purposes of resale pursuant to the B&H License that were not otherwise located at the address of record with the Missouri Department of Revenue.

87.     Upon information and belief, at no time during the period that B&H held a B&H License did B&H advise the Missouri Department of Revenue that the Odyssey or the Titan were being "stored" at a location other than B&H's address of record with the Missouri Department of Revenue.

88.     Upon information and belief, B&H made no application for renewal of the B&H License in 2013 for the year of 2014, or any subsequent year such that B&H was not a licensed dealership from January 1, 2014, and at all times thereafter.

89.     Upon the termination of the B&H License, B&H was required by law to title and register any cars with the State of Missouri and pay applicable sales tax for any cars it owned as a dealer that were not reflected as having been sold pursuant to its dealer license in the periodic sales reports filed with the Missouri Department of Revenue.

90.     Upon information and belief, as of the date of this Complaint B&H has failed to pay sales tax for the Odyssey or Titan and has taken no action to transfer title to the vehicles to itself or any other party or to obtain a valid registration for those vehicles.

91.     Upon information and belief, in each of the renewal applications the Debtor Husband was represented to the Missouri Department of Revenue as an owner of B&H.

92.     Upon information and belief, following the approval of each of the renewal applications, the Missouri Department of Revenue issued a Master Plate that was good for the term of the B&H License.

93.     Upon information and belief, the State of Missouri does not use stickers as a means of updating its dealer plates but rather issues new plates each year in the number appropriate for the applicable dealer license, such plates being good for the term of the then current dealer license.

94.     Neither Debtor disclosed their legal and/or equitable interest in the Odyssey in the Schedules.  The Debtors have not paid sales tax on the Odyssey to the State of Missouri or the State of Florida nor have they ever registered the Odyssey in any state.  As of the filing of this

Complaint, the Debtors are holding an open title to the Odyssey thereby exposing the prior owner to potential liability in the event of an accident.

95.     Upon information and belief, the Debtor Husband and/or the Debtors have a legal and/or equitable interest in the Titan that was not disclosed in the Schedules.

96.     From January 1, 2014, and at all times subsequent both Debtors have operated the Odyssey and/or the Titan in Florida without a valid registration, using false tags with the intent to  hinder, delay, or defraud the State of Florida and their various creditors.

97.     Prior to January 1, 2014, and at least from the date of acquisition of the Odyssey, the Debtor Husband used B&H as a means by which he could acquire and hold vehicles for his and the Debtor Wife's use without acknowledging their legal and equitable ownership thereof, without the Debtors performing their statutory obligations related to ownership of the vehicles and as a means to hinder, delay, and defraud their creditors and the State of Missouri and Florida.

98.     In the 341 Meetings of Creditors and the September 3rd Examination, the Debtor Husband has conditionally or unequivocally denied having any ownership interest in B&H or at any time being employed by B&H, asserting only an informal relationship without any contractual obligations or benefits.

99.     If the Debtor Husband did not hold an ownership interest in B&H and/or was not employed by B&H, the Debtor Husband would have no legal or statutory right to retain possession of the Odyssey or Titan and to drive those vehicles over a period of years with dealer plates and pursuant to the B&H License or to obtain insurance without naming B&H as a beneficiary of the insurance policy.

100.    Similarly, the Debtor Wife would have never had the right or entitlement to drive the Odyssey or the Titan with dealer plates and pursuant to the B&H License or to obtain insurance without naming B&H as a beneficiary of the insurance policy.

101.    All of the actions by the Debtors subsequent to the acquisition of the Odyssey and Titan are consistent with ownership of the vehicles, as they regularly drove the vehicles, insured them, maintained and repaired them.

102.    The Debtors did not produce the title to the Titan to the Trustee, alleging that it was in the custody and control of B&H. However, Debtor Husband testified at the September 15th 2004 Exam that the titles and proof of insurance were located in the glove boxes of both vehicles.

## PURCHASES OF GOLD, SILVER, BULLUION AND PRECIOUS COINS

103.    On or about October 15, 2012, the Debtors received a joint and several payment of $1,137,197.59 from F&S pursuant to a settlement reached in the Employment Litigation (the "F&S Settlement Proceeds"), which was wired into the Debtors' FCB Account.

104.    The Debtors have testified that they used a portion of the F&S Settlement Proceeds to purchase gold, silver, bouillon, and precious coins from Tulving for resale.

105.    Between the dates of November 12, 2012, and December 5, 2013, the Debtors made payments from the FCB Account to Tulving in the aggregate amount of $577,127.41 for purchases of gold and silver coins, as well as substituting coins purchased from Tulving for different coins.

106.    In addition, one or both of the Debtors made purchases of silver or gold coins or bullion from local dealers or at coin shows in the aggregate amount of $75,954.38.

107.    The Debtor Husband testified that the Debtors did not receive all or a portion of coins purchased from Tulving in November 2012, the Debtors did not receive any of the coins purchased from Tulving  in December 2013, the coins that were sent for substitution were not returned, and seven (7) sealed "monster" boxes containing 3,500 coins were ultimately found to contain lead shot (the "Lead Shot"). However, the Debtors did not retain the Lead Shot, claiming that the Debtor Husband shipped, without requiring evidence of receipt, some of it to California in support of the Tulving Complaint.

108.    In or around January 2013, the Debtor Husband initiated a complaint with the Orange County District Attorney's Office (the "Tulving Complaint") that was forwarded to the California Office of Business Oversight.  The documents produced by the Debtors relating to the Tulving Complaint addressed only the alleged failure of delivery of the December 2013 product and the return of the coins being traded.  The Tulving Complaint references attachments, including e-mail communications between the Debtor Husband and Tulving, that were not produced to the Trustee.

109.    At some point subsequent to the Tulving Complaint an employee of Business Consumer Alliance attempted to liaise between the Debtors and Tulving but was not successful.

110.    The Debtor Husband has testified that the Debtors incurred a loss of approximately $300,000 as a result of the actions of Tulving.

111.    On March 10, 2014, Tulving filed a bankruptcy case in the United States Bankruptcy Court, Middle District of California, Case No. 14-11492-ES (the "Tulving Bankruptcy").

112.    Shortly after the filing of the Tulving Bankruptcy, the Court appointed R. Todd Neilsen (the "Tulving Trustee") as trustee and the case converted to a Chapter 7.

113.    The Tulving Trustee made extraordinary efforts to identify all potential claimants from the Tulving Bankruptcy and communicated with them by mail and by e-mail to urge the filing of a claim as well as maintaining a regularly updated website.

114.    The Debtor Husband testified at the 341 Meetings of Creditors and 2004 Examinations that he received no communications or correspondence from the Trustee and did not file a claim in the Tulving Bankruptcy for any amount.

115.    Upon information and belief the Debtors do not have a meritorious claim against Tulving or in the Tulving Bankruptcy.

116.    The fact that the Tulving Trustee has not identified the Debtors as creditors of Tulving suggests that the Tulving books and records in the custody and control of the Tulving Trustee indicate that all product paid for by the Debtors was received by the Debtors.

117.    Although the Debtor Husband testified at the 341 and the 2004 Examinations that the Debtors made multiple sales of the Tulving coins in late 2012 and early 2013, in the six (6) months since the Petition Date the Debtors have been unable to produce any documents evidencing such sales.

118.    Upon information and belief the Tulving Trustee has not received any claims from creditors suggesting that they received Lead Shot or any other foreign substance other than the gold or silver sold by Tulving.

119.    The Debtors' failure to produce the Lead Shot or any correspondence or communications relating to the same supports a conclusion that this simply did not occur.

120.    Based upon the lack of objective support for the Debtors' alleged losses, the absence of any communication by the Tulving Trustee, the apparent disinterest in making a claim in the Tulving Bankruptcy by a person who styles himself as a professional litigator at a

time when the Debtors have testified that there were having financial distress, it appears that the Tulving losses are alleged as a means to explain otherwise unexplainable loss of assets.

121.    The Tulving explanation for loss of assets appears to be consistent with the Debtors' omissions, misrepresentations, and outright lies that are otherwise alleged in this Complaint.

122.    Minimal records and documents were maintained by the Debtors to reflect their purchases of gold, silver, bullion, and precious coins from any other source.


## TAX RETURNS

123.    The Debtor Wife prepared the federal tax returns for the 2012 and 2013 tax years using a Turbo Tax program with the assistance and participation of the Debtor Husband.

124.    The Debtor Wife testified that she did not review or retain any documentation regarding the Debtors' disposition of gold, silver, bullion and precious coins procured from Tulving and other sources and neither requested nor obtained any specifics of the alleged Tulving losses from the Debtor Husband.

125.    The Debtor Husband testified that he would "true up" the tax basis and sale price of any gold,  silver, bullion or precious coins transactions in connection with the end of the tax year but admitted that at best he would use a paper tablet that indicated by plus or minus whether a transaction had made or lost money.

126.    No documents were produced by the Debtors over the course of almost five (5) months from the Petition Date that would provide any evidence as to the specifics of any sale of gold,   silver, bullion or precious coins, to the extent that such sales occurred.

127.     The Debtors' federal income tax returns for 2012 and 2013 indicate the home address of the Debtors as 2085 Nottingham Court, Titusville, Florida, which is in fact the residence of the Debtor Husband's parents, Vernon and Rickie Rome ("Parents' Address").

128.     The 2012 return includes a long-term loss associated with a March 2012 sale of real property that was not reported on a Form 1099-B, income related to a distribution under a qualified plan, a deduction for payment of $11,193 in taxes, and payment of $440 in real estate taxes. The F&S Settlement Proceeds in excess of $1,000,000.00, are not disclosed on the return.

129.     In addition, Debtors have provided no federal income tax returns for any years for any of their numerous companies or business enterprises.

## DEBTORS' LITIGATION ACTIVITY

130.     In or around 2009, various lawsuits were filed against each or both of the Debtors and/or against the Debtor Husband's companies and continued to be filed over the next several years, many of which resulted in judgments against the Debtors individually or jointly.

131.     In addition to the lawsuits listed by the Debtors in response to Question No. 4 of the SOFA, there were additional lawsuits filed including but not limited to: a)  an eviction lawsuit against Wade Rome in Missouri Case No. 09-BA-CV05246; b) a mechanic's lien filed by Con-AGG of Mo, LLC against Delmart Development, LLC Case No. 09-BA-MC-00273; c) a claim by Con-AGG of Mo, LLC against the Debtor Husband Case No. 09-BA-CV-03186; d)  a claim by Mid-City Lumber Co, Ltd. against the Debtor Husband Case No. 09-bA-MC-0223;  and e) a case by Brownfield Oil Co., Inc. against the Debtor Husband Case No. 09-RA-CV-01352.

132.     Included in the Schedules are several substantial judgments obtained against one or both of the Debtors as well as claims for attorneys' fees by counsel that represented the

Debtors and Debtor Husband's companies and were not paid for their services.  Also included are medical debts, consumer credit debts, and utility bills incurred from 2009 through the Petition Date.

### AUTOMOBILE AND RENTER'S INSURANCE

133.    For the period of June 2012 through August 11, 2014, the Debtors carried Missouri insurance on their vehicles, even though the vehicles were allegedly being operated predominantly in Florida and Nebraska.

134.    The Missouri insurance policy showed the Debtors' address as the Missouri Address and indicated the vehicles were garaged at 1813 Oakhill Drive, Macon, Missouri even though that property had been foreclosed several years prior.

135.    The Missouri insurance policy in 2014 also included insurance for a Honda Element even though one or both of the Debtors had transferred ownership of that vehicle to their son, Chase Rome.

136.    In August 2014, the Debtors procured Florida insurance from Geico on the Odyssey and Titan now using their Florida Residence (2085 Eastwood Drive, Merritt Island, Florida) as the insureds' address.

137.    Upon information and belief one or both of the Debtors misrepresented or omitted material facts regarding their residence and the ownership of the vehicles that are the subject of the Missouri insurance.

138.    Similarly, one or both of the Debtors misrepresented or omitted material facts regarding the ownership of the vehicles that are the subject of the Florida insurance.

139.    The Lease for the Nebraska Address, defined and addressed below, did not require renter's insurance to be procured.  Nevertheless, the Debtors applied for and obtained

personal property and liability insurance for the Nebraska Address for the duration of the Lease, even though they testified that they vacated the property with almost a year of the Lease term remaining.

140.    On the other hand, the Florida Residence Lease with Sandra Trudeau and the Debtor Husband's lease of the warehouse property from Noro, Inc., required insurance that was never purchased or obtained.

## THE DEBTORS' DOMICILE AND RESIDENCE

141.    The Debtor Husband leased the Nebraska Residence (432 S. 11th Street, Apt. 2, Lincoln, Nebraska) for a two year term beginning in May 2012.

142.    Neither of the Debtors resided at the Vernon and Rickie Rome Residence located in Titusville, Florida at any time relevant.

143.    Debtors have testified that Debtor Wife moved to Nebraska in 2012 at approximately the same time the Debtor Husband moved to Florida, intending Nebraska to be her domicile.

144.    Despite alleging that the Nebraska Address was intended to be her domicile, the Debtor Wife failed to obtain a Nevada driver's license within thirty (30) days of establishing a residence in that state and did not register the Odyssey as required by Nebraska law.

145.    The Debtor Wife also did not register to vote in Nebraska, open a bank account, or take any other action consistent with an intention to establish a domicile in Nebraska.  The Debtor Wife did not file a Nebraska income tax return despite jointly and severally receiving over $1,000,000 during the period she allegedly lived in Nebraska.

146.    Although the Debtor Husband indicated in the SOFA and in testimony at the 341 Meetings and 2004 Examinations that he never resided at the Nebraska Address, the documents

produced by the Debtors and testimony adduced at the 2004 Examinations show that the Debtor Husband spent periods of time at the Nebraska Address with the Debtor Wife.

147.    In addition, upon information and belief, the Debtor Husband submitted documents under oath in pending litigation stating that he resided at the Nebraska Address.

148.    Despite testifying in the 2004 Examinations that the Debtor Husband intended to establish the Florida Address as his domicile, the Debtor Husband failed to obtain a Florida driver's license within thirty (30) days of establishing a residence in Florida and did not register the Titan as required by Florida law.

149.    Both Debtors maintained a post office box in Macon, Missouri (the "Missouri Address") after vacating their Missouri properties and ostensibly relocating to either Florida or Nebraska.

150.    The Debtors continued to utilize the Missouri Address for purposes of acquiring or renewing insurance policies for years after they had no residence in the state, and for other matters by which they were benefitted by retaining a Missouri address.

151.    The Debtor Wife established the FCB Bank Account with the Debtor Husband in October 2012, and thereafter relied principally on that account for the purposes of making cash withdrawals and deposits on a regular basis for which she had to be physically present.

152.    The FCB Account statements were delivered to the Debtors at the Florida Residence.

153.    The Debtor Wife also established a customer relationship with a beauty salon and a nail salon in Florida and made regular visits to those establishments.

154.    The establishment of the Missouri Address, the Nebraska Address, the Florida Address, and the Vernon and Rickie Rome Address as addresses or locations of the Debtors

furthered the strategic objectives of the Debtors, including but not limited to:   (a) creating obstacles to the service and prosecution of legal claims and/or discovery in aid of execution by their individual or joint creditors; (b) creating a putative basis to resist jurisdiction of impending or pending litigation in a particular state; (c) isolating specific transactions or business activities; d) facilitating the legal fiction that the Odyssey and Titan were property of B&H and the use of the B&H License and Master Plate; e) facilitating the acquisition or renewal of insurance policies on the Odyssey and the Titan as well as other vehicles being driven by the Debtors; or members of their family; f) avoiding the statutory obligations attendant to residence or domicile in a particular state, including but not limited to obtaining a driver's license, registering vehicles, paying personal property tax, and filing state income tax returns; g) establishing residency for purposes of enrolling Gage Rome in a Florida high school that afforded an opportunity to play sports and potentially seek a scholarship for college; and h) facilitating the ability to attend football games and spend time with their children located in two different states.

## **ASSETS OMMITTED IN DEBTORS' SCHEDULES**

155.   At the July Meeting of Creditors, the Debtor Husband testified that he did not keep gold and silver purchased from Tulving in a safe but rather kept it under the mattress of his bed.

156.   At the August Meeting of Creditors, when the Trustee's counsel enquired of the Debtor Wife if she kept her gun in a safe, the Debtor Husband interjected "that's privileged" and the Debtor Wife simply said "No."

157.   Although this line of question raised the issue of a safe, neither Debtor took the opportunity to advise the Trustee that one or more safes located in their Florida Residence had not been included in their Schedules.

158.    At the April 341 Meeting of Creditors the Debtors indicated that there were six errors in their Schedules. There errors were identified as follows:

A.    On Schedule F, the debt to Robert Thomas, Bryan Kaufman and Laura Walsh was identified as a joint debt when it should have identified the debt as solely the Debtor Husband's;

B.    On Schedule F, indicating that all claims are disputed;

C.    On Schedule B, adding a term life insurance policy with Jackson National Life Insurance Company and indicating the term life insurance policy with Northwestern Mutual contained multiple policies;

D.    On their SOFA, the information contained in response to Paragraph 5 would be moved to Paragraph 3;

E.    On their SOFA, the information contained in response to Paragraph 14, should state "Debtors' sons" and not "Debtor's son", and adding various other property belonging to Chase Rome, their oldest son; and

F.    On their SOFA, the information in response to Paragraph 18, should reflect that Rome Enterprises, LLC, stopped doing business in 2012, not 2010.

159.    During the August and September 2004 Examinations, both Debtors were asked specifically whether the information contained in the Schedules was complete, true and accurate and whether there were any further amendments or corrections that needed to be made to their Schedules.

160.    Both Debtors testified that other than the six verbal amendments or corrections made at the April Meeting of Creditors, the Schedules were complete, true and accurate and there were no additional amendments or corrections to be made.

161.    On August 12, 2015, the Trustee conducted an inspection of the Florida Residence for the purpose of identifying and recording information regarding the personal property shown in the Schedules.

162.    Upon arrival at the Florida Residence, the Trustee viewed two Liberty Lincoln safes (collectively, the "Liberty Safes") that were at least five (5) feet in height and two (2) feet in width.   The Debtors indicated that they owned one of the Liberty Safes and Chase Rome owned the other one.   The Liberty Safes had not been included in the Debtor Documents produced to the Trustee over the span of the dates on which the 341 Meeting was conducted nor reflected in photographs of the Florida Residence produced by the Debtors to the Trustee (collectively, the "Debtor Photos").

163.    The Debtors refused to permit the Trustee to view the contents of the Liberty Safe they claimed belonged to Chase Rome.

164.    During the August Inspection, the Trustee also observed forty five (45) or more cases of Mountain House freeze-dried food, having an approximate aggregate value in excess of $5,000.00, that were not reflected on the Schedules (the "Camping Supplies").

165.    The Trustee also observed a large quantity of ammunition of various types that had not been disclosed on the Schedules (the "Ammunition").

166.    The Debtor Husband testified at the September 3 2004 Exam that he had obtained some of the Ammunition as a gift from Vernon Rome post-petition following the pre-petition death of his uncle.

167.    Although the Trustee asked to see the Lead Shot allegedly substituted for 3,500 sealed silver coins or the boxes and seals that had contained the "silver" during the Inspection, the Debtors did not produce anything other than a single box (1 of 7), indicating that the Debtor

Husband had mailed some or all of the Lead Shot and possibly other items to someone in California in connection with the Tulving Complaint.

168.    When the Trustee asked to see the Debtor Truck during the Inspection she was told that the vehicle was in Nebraska.

169.    The Debtors permitted the Trustee to view the interior and trunk of the Odyssey and to review the documents in the glove compartment.

170.    The Debtors refused to permit the Trustee to view the interior and trunk of the Titan or to review the documents in the glove compartment.

171.    The Trustee's August Inspection evidenced that the Debtors failed to include their on Schedule B and did not identify:

> A.    The Odyssey or Titan as property legally or equitably owned by the one or both of the Debtors;

> B.    One or more safes located in the Florida residence;

> C.    The Camping Supplies; and

> D.    The Ammunition.

172.    In addition, the Debtor Husband failed to include in Schedule B his interest in the corporate entities other than Apex.

173.    None of the pictures of personal property submitted to the Trustee in response to the Trustee's Document Request included pictures of the Liberty Safes.

174.    Other than the self-serving testimony of the Debtors no documentation or evidence was produced by the Debtors in support of the Liberty Safe being owned by Chase Rome rather than by one or both of them.

175.     One or both of the Debtors at some point testified that their response to Question No. 14 of the SOFA was meant to identify the "safe" listed there as a safe held by or for the benefit of Chase Rome, in addition to other inconsistent testimony on the subject.

176.     On September 15, 2015, in connection with the final hours of the Debtor Husband's September 15 2004 Exam, the Debtor Husband produced ten (10) pictures of the Liberty Safes and indicated that the Debtors produced at least three (3) of such pictures to the Trustee and then later acknowledged that it was possible that the Debtors had intended to produce the pictures but had not done so by inadvertence or mistake.

177.     On September 16, 2015, the Debtor Husband filed an Amendment To Schedule B: Personal Property [Docket #57].

178.     The Amendment To Schedule B: Personal Property adds "Husband's safe", with a value of zero as the safe was included in the household goods value, to Item 4 of Schedule B.

179.     The Amendment To Schedule B: Personal Property is contrary to the repeated testimony of the Debtors that they jointly owned one of the three safes located in their Florida residence.

180.     In addition, the Debtors did not amend their Schedules to identify the verbal amendments made at the April MOC, and failed to correct omissions or errors, including but not limited to: a) the failure to include in Schedule B one or more safes, the Camping Supplies, and the Ammunition; b) the Debtor Husband's failure to include in Schedule B his interest in corporate entities other than Apex, including BH; (c) the failure to schedule the Odyssey and Titan as property legally or equitably owned by the one or both of the Debtors; and d) the Debtors' failure to include property belonging to Chase Rome or Taquan Kelly located in the Florida Residence in paragraph 14 of their SOFA.

**CASH TRANSACTIONS**

181.    Following receipt of the F&S Settlement Proceeds both Debtors regularly engaged in numerous cash transactions, often in substantial amounts.

182.    The FCB Account shows a pattern of the Debtors both making large withdrawals and then at a later date making smaller cash deposits sometimes many times within the same week.

183.    The statement for the FCB Account from October 2012 through April 2014, evidence that the Debtors obtained the following amounts of cash:

    A.    October, 2012: $20,000.00

    B.    November, 2012: $59,250.00

    C.    January, 2013: $186,000.00

    D.    February, 2013: $19,000.00

    E.    March, 2013: $29,610.00

    F.    April, 2013: $18,275.00

    G.    May, 2013: $25,000.00

    H.    June, 2013: $27,337.00

    I.    July, 2013: $40,484.00

    J.    August, 2013: $50,419.00

    K.    January, 2014: $5,500.00

    L.    February, 2014: $1,200.00

    M.    April, 2014: $13,000.00

184.    The Debtor Husband has previously testified in other litigation that he kept large amounts of cash in his residence, some of which resulted from buying and re-selling undisclosed items.

185.    When examined on the purpose of the withdrawals, the most common response was that the Debtors did not know or could not remember. Debtor Husband also testified he did not trust banks and preferred not to keep his money in the bank. Debtor Husband testified that he would withdraw the funds, replacing them as needed.

186.    Similarly, when examined on the source of the cash deposits, for all but a small number of transactions, the Debtors were unable to provide any explanation of the source of the cash being deposited.

187.    Both Debtors were examined on the expenses that are reflected in the Schedules, which did not appear to be supported by the FCB Account transactions and for which there were few or no receipts or invoices that were even close to the amount claimed; however, the Debtors could not explain the discrepancy.

188.    Although not cash transactions, the FCB Accounts reflects payments in the aggregate amount of $69,250.00, made to Vernon Rome with an interlineation on the memo line of the check stating "loan repayment."

189.    Nevertheless, the Debtor Husband testified at the 2004 Exam that, other than the loan repayment made on the eve of the Petition Date, all of those transactions were the return of monies held "in trust" by the Debtor Husband in connection with deals (that did not result in a cash recovery) from funds provided by Vernon Rome to the Debtor Husband in connection with such opportunities.

190.    Despite the large volume of documents provided by the Debtors to the Trustee and pursuant to the Notice of 2004 Examination, there were substantial records that were not complete or that were not produced that had been requested by the Trustee for purposes of administering the estate for the benefit of creditors, including but not limited to: a) complete bank statements for the Debtor Husband's entities (due to incompleteness of returns it is impossible to trace the flow of monies between the entities and the entities and the Debtors; b) financial statements, profit and loss statements and corporate tax returns for the Debtor Husband's entities; c) legal invoices supporting the claim that the Debtor Husband funded $400,000 in legal fees; d) receipts or other records reflecting the sale of gold and silver coins and bullion that occurred in 2012 and 2013 or that were not reported on the SOFA; e) attachments to the Tulving Complaint; f) supporting documents for tax returns, including but not limited to proof of payment of personal property tax in 2012; and g) documents, records, or receipts supporting the source of cash deposits or the use of cash withdrawals.

## OBJECTION TO DISCHARGE OF
## DEBTORS PURSUANT TO SECTION 727(a)(3)

191.    This is an action seeking to deny the Discharge of the Debtors pursuant to 11 U. S. C. §§ 727(a)(3).

192.    Beltramo alleges and incorporates the allegations in paragraphs 1 through 190, above, as if fully set forth herein.

193.    The Debtors have concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtors' financial condition or business transactions might be ascertained.

31

194.     The Debtors failure to maintain books and records pertaining to their financial condition or business transactions is not justified under all of the circumstances of the case.

WHEREFORE, Beltramo respectfully requests that this Court deny the discharge of the Debtors and grant to Beltramo any other and further relief, including but not limited to attorneys' fees and costs.

## COUNT II
## OBJECTION TO DISCHARGE OF
## DEBTORS PURSUANT TO SECTION 727(a)(4)(A)

195.     This is an action to deny the Discharge of the Debtors pursuant to Section 727(a)(4)(A).

196.     Beltramo realleges and incorporates the allegations in paragraphs 1 through 190, above, as if fully set forth herein.

197.     The Debtors knowingly and fraudulently made several material false oaths in their Schedules, SOFA, testimony provided at the Meetings of Creditors, and testimony provided at the September 2, 3, and 15, 2015, 2004 Examinations.

198.     The Debtors intentionally and knowingly omitted or falsely classified assets in their Schedules.

199.     The Debtors knew their Schedules and SOFA were filed under oath, that they were testifying under oath and that their Schedules, SOFA and testimony were false.

200.     The Debtors' actions were taken to deceive the Trustee and the creditors by making false statements as to their assets and their use and disposition of assets prior to the Petition Date.

201.     The Debtor Husband's testimony at the 341 Meetings of Creditors and September 3 and 15, 2015, 2004 Examinations changed between Meeting and Examination dates and was

contrary to the Debtor Husband's sworn testimony in other litigation.

WHEREFORE, Beltramo respectfully requests that this Court deny the discharge of the Debtors and grant to Beltramo any other and further relief, including but not limited to attorneys' fees and costs.


## COUNT III
## OBJECTION TO DISCHARGE OF
## DEBTORS PURSUANT TO SECTION 727(a)(5)


202.     This is an action to deny the Discharge of the Debtors pursuant to Section 727(a)(5).

203.     Beltramo realleges and incorporates the allegations in paragraphs 1 through 190, above, as if fully set forth herein.

204.     The Debtors have failed to explain satisfactorily their loss of assets or deficiency of assets to meet the Debtors' liabilities.

205.     Since 2007, the Debtors have received approximately $2,700,000.00 from the Asset Sale, F&S Settlement Proceeds and a fire insurance claim.

206.     Since October, 2012, the Debtors have received approximately $1,200,000.00 from the F&S Settlement Proceeds and a fire insurance claim.

207.     The above amounts are in addition to funds received from the Debtor Husband's employment and the sale of other assets of the Debtors which, upon information and belief, are substantial.

WHEREFORE, Beltramo respectfully requests that this Court deny the discharge of the Debtors and grant to Beltramo any other and further relief, including but not limited to attorneys' fees and costs.

Dated this 18th day of September, 2015.

LAW OFFICE OF GALE M. BOBENHAUSEN, P.A.

/s/ Gale M. Bobenhausen
28051 U.S. Highway 19, North
Suite 107
Clearwater, FL 33761
Telephone: 727-242-0230
Facsimile: 727-252-0231
Fla. Bar: 0434345
gmbobenhausen@gmbpalaw.com


I hereby certify that a true copy of the foregoing has been furnished this 18th day of September, 2015, via CM/ECF electronic notice to all creditors on the creditor's matrix and by electronic transmission to:

Jeffrey Ainsworth, Esquire
BransonLaw, PLLC
1501 E. Concord Street
Orlando, FL 32803

Robert B. Branson, Esquire
BransonLaw, PLLC
1501 E. Concord Street
Orlando, FL 32803

Cheryl Thompson, Esquire
Thompson Law Practice
301 W. Platt Street, Suite 656
Tampa, FL 33606

Carla P. Musselman, Trustee
1519 Druid Road
Maitland, FL 32751

Bradley M. Saxton, Esquire
Winderweedle, Haines, Ward &
Woodman, P.A.
P. O. Box 1391
Orlando, FL 32802

and by U. S. Mail on September 20, 2015, to:

Wade Martin Rome
2085 Eastwood Drive
Merritt Island, FL 32952

Kathleen Maloney Rome
2085 Eastwood Drive
Merritt Island, FL 32952

U.S. Trustee
Office of the United States Trustee
George C. Young Federal Building
400 West Washington Street
Suite 1100
Orlando, FL 32801

LAW OFFICE OF GALE M. BOBENHAUSEN, P.A.

/s/ Gale M. Bobenhausen
28051 U.S. Highway 19, North
Suite 107
Clearwater, FL 33761
Telephone: 727-242-0230
Facsimile: 727-252-0231
Fla. Bar: 0434345
gmbobenhausen@gmbpalaw.com